THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. WILLIAM BRADLEY, JR., PLAINTIFF IN ERROR.

Submitted May 2, 1939—Decided June 29, 1939.

Before BROGAN, CHIEF JUSTICE, and Justices DONGES and PORTER.

For the plaintiff in error, *William Charlton.*

For the defendant in error, *Joseph Altman.*

The opinion of the court was delivered by

DONGES, J. From the meagre record of the trial of this case and the statements contained in the briefs filed in this court, it appears that plaintiff in error was indicted for embracery and was convicted by the verdict of a jury, after trial in the Atlantic County Court of Quarter Sessions. The

testimony and proceedings upon the main issue are not included in the state of case, the record being confined to the testimony taken upon the objection of plaintiff in error to the competency to testify of a witness offered by the state, upon the ground that she was the wife of the accused. The only question submitted herein is as to the propriety of the trial judge's ruling that the witness and the accused were not shown to be husband and wife, and that she was competent to testify.

The record discloses that the first witness called by the state was objected to by the defense on the ground that she was disqualified from testifying to anything except the fact of marriage. The trial judge thereupon excused the jury and proceeded to take testimony on the question of the alleged marriage between the witness and defendant, in accordance with the practice approved in *State* v. *Gordon,* 46 *N. J. L.* 432.

From the testimony submitted it appears, without contradiction, that the defendant and the witness began living together in 1930 in the city of Philadelphia, Pennsylvania. It is admitted by both of the parties that they lived together and cohabited from 1930 to 1936, in Philadelphia and in Atlantic City. There is testimony from a number of witnesses that the defendant and the witness lived together; that she was introduced as Mrs. Bradley and was regarded as the wife of defendant. It is undisputed that both parties were competent to marry, both being single persons when their meretricious relations began. It is further admitted that no ceremonial marriage took place.

The parties first met on Labor Day of 1930, and thereafter were a great deal in each other's society. The defendant testified as follows:

"*Q.* Did you and she discuss marriage? *A.* Yes. *Q.* And what sort of discussion was that? *A.* Well, I'm a Catholic, and I suggested we would be married by a priest. She wanted to be married by a magistrate—justice of the peace, or something, see, and I wouldn't really consider myself legally married that way. *Q.* That is, according to church laws? *A.* According to the church laws. *Q.* How long a period did that

take? *A.* Well, that discussion went on for a little while, and then I said, well, if you want to be married by a justice of the peace, I wouldn't consider myself married, so we'll go on living the way we are, and in October—the 17th of October—it happened to be her birthday, I gave her a wedding ring, and she has the wedding ring. *Q.* And from that moment on, you went to live with her? *A.* Yes. *Q.* And prior to October 17th, 1930, did you have any relations with her? *A.* None whatsoever. *Q.* And that night was the first time you ever had sexual intercourse with her? *A.* That's right. *Q.* And you gave her a wedding ring on her birthday? *A.* That's right."

It will be observed that the defendant testified that he said to the witness, in response to what he asserts she demanded, "I wouldn't consider myself married, so we'll go on living the way we are," which may be construed as acquiescence in the parties living together otherwise than as husband and wife.

The witness testified, as follows:

"*Q.* Did Mr. Bradley ever make offers of marriage to you? *A.* He did, several times. *Q.* And what did you say? *A.* I refused to marry him always. I told him never, under any circumstances, would I marry him. *Q.* You never considered yourself Mrs. Bradley, through all this relationship? *A.* Not in any way."

She further testified that when she came to Atlantic City and people called her Mrs. Bradley, it embarrassed her, but in view of the relations between her and defendant, she felt powerless to do anything about it.

If the determination of this case rested upon cohabitation and reputation of marriage, the evidence conclusively established both. From these a presumption of marriage arises. But there is a presumption only, and to effectuate a valid marriage it is necessary that the parties agree to marriage. Marriage under our law is a civil contract, and mutual consent is essential. As was said in *Atlantic City Railroad Co.* v. *Goodin,* 62 *N. J. L.* 394, by Mr. Justice Collins:

"Dr. Bishop makes it quite plain that in this country, in the absence of prohibitive legislation, no more is required to constitute a legal marriage than that the man shall

declare in words of the present tense that the woman is his wife and that the woman shall assent. No witnesses need be present and no particular ceremony is necessary."

This is the undoubted law of this state, as many authorities hold.

The witness testified:

"Q. Did you ever consider yourself William Bradley, Junior's, wife? A. Never in any way. Q. And did you ever enter into this association and companionship with a viewpoint of being known as his wife, or to be his wife? A. I did not. Q. And it was never any agreement between you? A. Absolutely not. Q. Did the affair happen casually, and continue on? A. Yes."

Nowhere in his testimony does the defendant say that when he proposed marriage the woman agreed. His testimony is that she objected to marriage by a priest; that he responded he would not consider himself married by any other method, "so we'll go on living the way we are." She denies that he gave her a ring on October 17th, 1930, or at any other time. We are, therefore, confronted by the conflicting stories of the parties. But strong corroboration of the witness's testimony that the parties never agreed to marriage and never, as between them, regarded themselves husband and wife, is found in the uncontradicted testimony that after the separation of the parties in 1936, he and his father wrote her, at her then place of residence in Philadelphia, a number of letters, all of which were addressed by her name, and not as Mrs. William Bradley. The name Bradley was not used in any of these letters.

When her testimony is considered, together with the circumstances of these letters addressed by the name she asserts was hers and was so known by defendant and his family, and the absence of any proof that she assented to marriage with defendant, but that his proposal "so we'll go on living the way we are," was the arrangement between them, we conclude that the trial judge did not err in holding that a marriage agreement was not established and in permitting her to testify.

The judgment under review is affirmed.